FILED

2012 Feb-10  PM 12:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN  DIVISION

| | | |
|---|---|---|
| **BARBARA ANN WILSON,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | |
| | ] | **CV-10-BE-2386-S** |
| | ] | |
| | ] | |
| **CITY OF BIRMINGHAM, et. al,** | ] | |
| | ] | |
| **Defendants.** | ] | |
| | ] | |
| | ] | |
| | ] | |
| | ] | |

## MEMORANDUM OPINION

This case, alleging that Defendants, the City of Birmingham and the Birmingham Library Board, created a sexually hostile work environment in violation of Title VII, is before the court on "Defendants' Motion for Summary Judgment" (doc.31).  This motion has received thorough briefing.  For the reasons stated in this Memorandum Opinion, the court finds the motion is due to be DENIED.

## I.  PROCEDURAL BACKGROUND

The Plaintiff, Barbara Ann Wilson, filed a Title VII charge of discrimination with the EEOC on October 7, 2009.  Wilson's EEOC charge asserts that she was subjected to a sexually hostile work environment because of conduct of Library patrons that management allegedly did not address, including patrons' conduct of  "trolling pornographic web sites, masturbating and sexually harassing employee."   With respect to the pornographic web sites, the Plaintiff stated in

1

her charge: "There are times when I have to log patrons on the web sites and there is no way I can avoid seeing pornographic images while conducting job functions in the library."  (Doc. 32-1, at 32).

On September 2, 2010, Wilson filed this action against the Birmingham Public Library Foundation and the City of Birmingham asserting only one count, that Defendants violated Title VII in creating a sexually-charged hostile work environment (doc. 1).  On September 20, 2010, the Birmingham Public Library Foundation filed a motion to dismiss (doc. 5), and the court entered an Order to Show Cause why that motion should not be granted (doc. 7).  In response to the court's Order (doc. 9), the Plaintiff noted that Defendants had provided no support for their contention that the Foundation is not a proper Defendant and requested an opportunity to conduct discovery regarding which entity was the Plaintiff's employer for the purposes of Title VII.  The Plaintiff also filed a motion to amend its complaint by adding as party-Defendants the Birmingham Library Board and Renee Blalock (doc. 10).  The court denied the motion to dismiss and granted the motion to amend (doc. 11).

 On October 21, 2010, the Plaintiff filed an Amended Complaint, asserting a single claim of sexually charged hostile work environment against the Birmingham Public Library Foundation and the City of Birmingham, as well as against two new Defendants:  the Birmingham Library Board - a separate entity from the Foundation, and Renee Blalock in her official and individual capacities (doc. 12).  The Birmingham Library Foundation filed a second motion to dismiss (doc. 13), and Renee Blalock also filed a motion to dismiss (doc. 17).  The court entered Orders to Show Cause on these two motions to dismiss (docs. 14 & 18, respectively).  Because the Plaintiff did not respond to the Orders to Show Cause or otherwise oppose the motions to dismiss the

Birmingham Library Foundation and Renee Blalock, the court dismissed all claims against them and dismissed them as party Defendants. *See* Orders dismissing the Birmingham Library Foundation (doc. 19) and Renee Blalock (doc. 20).

In their Answer to the Amended Complaint, Defendants admitted that the Library Board was a legal entity subject to suit in this court. (Doc. 16, ¶ 7).

On July 20, 2011, the two remaining Defendants, the City of Birmingham and the Birmingham Library Board, filed a motion for summary judgment (doc. 31) which received thorough briefing.

## II.  FACTS

The court views the following facts in the light most favorable to the Plaintiff.  The court notes that Defendants "deny" some of the facts listed below, which Plaintiff presented as undisputed.  However, because Defendants failed to support their denial with specific references to the portions of the evidentiary record upon which the disputation is based – as Rule 56(c), Appendix II, and the court's briefing Order all require –  Defendants have not properly disputed those facts.  To avoid this result in the future, Defendants should dispute facts by following the requirements for fact section of summary judgment briefs set out in Rule 56(c) and Appendix II.  The court also notes that, after filing hundreds of pages of evidentiary matter, Defendants list many facts in the argument section of their brief that were not set out in the fact section, and fail to provide a  citing reference for those facts.  *See, e.g.,* Defs.' Br. Doc. 32, at 18-21.  Because that practice also violates Rule 56(c) and Appendix II and because, pursuant to Rule 56(c)(3), "[t]he court need consider only the cited materials," the court does not include those uncited, unsupported "facts" in this recitation.

3

In 2002, the Plaintiff, Barbara Ann Wilson, began working as a librarian at the Birmingham Public Library.  In June of 2009, she was promoted to the position of Library II and continued to work in that capacity in the Business, Science and Technology section at the Library's Linn Henley and East Building in downtown Birmingham. The Library is a public facility and an average of about 440,000 people enter its downtown branch on a yearly basis. For most of her career at the Library, Wilson worked on the third floor of the downtown Library, and this floor contains a section with computers available for patron use.  Although cameras were present to record activity at the downtown Library, no camera existed to record the area where computers are located on the third floor.

### Library's Internet Policy

The Library provides Internet access to the public and its internet policy is a four-and-a-half page document, including the following statements:

> The Birmingham Public Library subscribes to a filtering service that . . . will be turned off at the request of any adult user.  The filter limits the amount of pornographic or obscene materials available on the Internet, but no filtering service is completely effective.  The Library does not control or edit what is made available or filtered out by this service

> The Internet and its resources contain a wide variety of information and opinions from varied points of view.  The library strives to balance the rights of users to access these resources with the rights of people to work in a public environment free from disruptive sounds and offensive visuals.  There are information resources on the Internet that are inappropriate for display in a public setting.  Staff members will request that a patron end an Internet session if in the staff member's judgement, the site is inappropriate.  Illegal or disruptive activities that interfere with users, services, or equipment are prohibited.
> * * *
> Dissemination or public display of obscene matter is a misdemeanor in Alabama. (13A-12-200.3)
> Dissemination or public display of obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts is a Class B felony in

4

Alabama.  (13-A-12-191)

Violation of ordinances 13A-12-200.3 and 13A-12-191 may subject you to loss of library privileges or criminal prosecution. . . .

* * *
II.  Unacceptable Uses of Network and/or Computers
Among the uses that are considered unacceptable and which constitute a violation of this Policy are the following:
A.  Uses that violate the law. . . .

Under the Library's internet policy, a patron can only access the Library's internet by first filling in his name and Library card number on the computer screen.  Once logged in, the patron is required to accept the Library's internet policy.  If he does not, he is barred from accessing the internet.  If a patron chooses to violate the law and policy, all computers in the Library have a filter program called *8e6.com* that is supposed to filter the patron from viewing pornographic sites.  Although the Library updates its software over the years, Library employees acknowledge that the filter system is not effective.

### Library Rules/"Patron Behavior Policy"

Defendants' brief states that the following policy is "made available to patrons in tear-off pamphlets that are easily distributed to patrons entering the facility."  (Doc. 32, at 30).  In stating that the policy is "available" and "easily distributed,"   Defendants do not specify whether the policy is indeed distributed to all patrons entering the facility or simply could be distributed.

* * *
2.  Noisy or disruptive behavior is prohibited.  Any verbal abuse or threatening gestures, whether toward staff or patrons, will not be allowed.
* * *
16.  Library equipment made available for public use must be operated in accordance with the guidelines established by the library.

5

* * *

19.  Any illegal act or conduct in violation of federal, state, or local law, ordinance or regulation is not permitted.

These rules are statements of existing policies as adopted by the Birmingham Public Library Board.  Any violation of these rules could result in expulsion from the library. Library employees have been authorized by the Board to enforce these rules.

### Other Library Policies

Since 2001, the Library has had what it characterizes as a "policy" in effect informing employees that they may encounter sights, acts, sounds, that may be objectionable to them:

> In your work at the Birmingham Public Library, you will see, feel, hear, touch, and encounter situations that may be objectionable to you.  The Library board strives to establish policies and procedures that balance the Library's responsibility as a public facility with its need to be safe and comfortable for the staff.  Of particular concern in today's Library is the possible exposure of staff to illegal sites on the Internet.  In order to minimize this exposure and to strive for a safe and comfortable working environment, the Library technologically blocks objectionable Internet sites.  Despite the Library's best effort, you may still encounter illegal use of the Internet.  As part of your job, you should be prepared to report the activity and to follow procedures to manage it.

The Library also has disseminated written policies prohibiting sex discrimination, harassment, and retaliation.

### Incidents at the Library

*Incidents involving Wilson*

During the course of her employment, Wilson was subjected to random criminal acts that the Library patrons committed as discussed below.  During the period from the commencement of her job through April 9, 2009, patrons made in appropriate comments about her body such as "You have some big titties," "You have a nice ass" and "Look at you just shaking that ass." (Wilson Aff. ¶3).  During that period, Wilson was subjected to pornography on a daily basis,

because patrons accessed pornography on Library computers.  The Library had filters that were designed to filter out sites showing sexually inappropriate images, but those filters were not effective. When patrons requested that she print pornographic pictures, she had to print them. Although she complained to her department head about having to print pornography, the department head responded, "If they pay for the printing, you have to print it."  *Id.*

On July 14, 2008, Wilson filed an incident report stating that a middle aged male Library patron had exposed his "private part" to a female while she was using a computer on the second floor and then followed her to the third floor.  A few months later, on December 2, 2008, Wilson reported an incident in writing where a male patron rubbed up against her with an erect penis and, when she tried to get away from him, he followed her around the Library.  She advised her immediate supervisor that she felt physically threatened.

From April 10, 2009 onward, Wilson was subjected on a daily basis to viewing pornography that Library patrons accessed in her presence.  Further, on at least two occasions between April 10, 2009 and the date she filed her EEOC charge on October 7, 2009, Library patrons fondled their genitals or masturbated in her presence.  Also during that time period, one patron rubbed up against her buttocks with an erect penis[1], and patrons asked her out on dates dozens of times.

Between the period of October 7, 2009 and when Wilson stopped working at the Library in November of 2010, the following conduct occurred at the Library: (1) Wilson continued to be

---

[1] Although the facts in Wilson's affidavit and brief state that this event occurred in the period between April 9, 2009 and October 7, 2009, her deposition testimony indicates that this event or a strikingly similar event occurred on December 2, 2008, as reflected above.  In her deposition, Wilson does not appear to claim that she suffered two incidents of a man brushing against her with an erect penis.

subjected to pornography on the Library computers on a daily basis, and many times the patrons would stare and smile at her as if they enjoyed watching her discomfort accompanying exposure to pornography; (2) in June of 2010, a patron looking at a pornographic site on his laptop turned the laptop around so that the pornographic image was facing her as she took  his ID and continued to stare at her even after she gave his ID back; (3) patrons asked her out on a regular basis; (4) one patron asked her out after commenting on how nice her body was, and grabbed her hand to keep her from moving; (5) another patron came in almost every day, sat near her desk, and stared at her, or, when she moved from her desk,  followed her from floor to floor; (6) still other patrons made inappropriate remarks such as "You have pretty lips" or "I want to paint your face;" and (7) during her last year with the Library, one patron leered at her and followed her around the Library, making comments like "When are we going to go out?" "Are you going to marry me?" and "Stop calling me a man whore."  (Wilson Aff., Doc. 38-1 ).  (The record is not clear whether the patron referenced in (7) above was the same as the one referenced in (5) above.) With one exception, male patrons accessed the pornographic sites referenced above that depicted only heterosexual sex acts or nude pictures of females without nude depictions of males.

Also as part of her job, Wilson was required to check laptops the patrons returned to document any history of accessing pornographic sites and advise IT, so IT could add those sites to the filter.

*Wilson's Reports of Incidents in Writing*

During the time period from the commencement of her employment at the Library through April 9, 2009, Wilson reported in writing two incidents of sexual harassment.  As reflected above, one involved a male patron exposing his "private part" to a female patron and

the other involved a male patron rubbing against Wilson with an erect penis and then following her around the Library. (Doc. 32-1, at 40-47).

During the time period from April 10, 2009 until she left employment at the Library in November of 2010, on three occasions Wilson reported in writing the patrons' conduct of sexually harassing her.  On October 12, 2009, both Wilson and another Library employee, Vera Broussard, filled out an incident report with the police complaining about having to confront a patron who accessed pornographic material sites on the computer. According to the report, Wilson spoke with the city magistrate about the problem, and a trespass warning was issued against the patron.  (Doc. 32-1, at 48-49).   On January 8, 2010, Wilson and Broussard reported another incident to Library security when a man named Jones stroked his private parts in the Library while looking at two young female patrons and followed one of the girls when she left the area.  Security made a copy of Jones's driver's license, and asked him to leave.  When Jones returned to the Library four days later, Wilson and Broussard again notified security.  According to the report, security officers again confronted Jones, asking him to leave the Library and not return.  (Doc. 32-1, at 51).

On November 19, 2010, Wilson filed a written report that an older man named Culver harassed her, calling her "a pretty lady," but not touching her and not saying "anything out of the way."  (Doc. 32-1, at 55).  In her deposition, Wilson elaborated that Culver had come to the Library on November 12, 2010 and asked her to help him find books, and then he returned on November 19, 2010, again asking for her help.  During these visits when she was helping Culver, he made comments like:  "Do you want to date me?" or "Can I come pick you up?" "Do you want to go out with me?"  Specifically on the November 12 date, he said "When can we go out?"

and Wilson responded "I don't do that."  He then said, "You sure are a good-looking woman"
and proceeded to make another comment.  According to Wilson, she then said: "Look, I am an
employee.  And you are a patron.  I will help you, but I will not put up with your comments."  As
Wilson tried to walk away, Culver tried to grab her hand, and Wilson left him, sat down and
began to cry.  Her supervisor, Karen Jackson, came by and the man tried to grab Jackson, too,
which resulted in security being called and the report entered.  To Wilson's knowledge, Culver
has not returned to the Library. (Doc. 32-1, at 68-92).

*Wilson's Verbal Reports*

Wilson testified that she did not report such conduct in writing every time it occurred
because "if I wrote a report each time it happened. . . I wouldn't have time to work."  (Doc. 32-1,
at 16, p. 63, l. 10-11).  In addition to the three written reports of alleged sexual harassment,
Wilson made additional verbal reports or complaints to her Department Head, Barbara Clotfelter,
about the harassment, and Clotfelter agrees that Wilson always reported sexual misconduct
properly not only to Clotfelter but also to Library security personnel.  Wilson testified that when
she complained to Clotfelter about having to print pornographic pictures at the request of
patrons, Clotfelter told her, "If they pay for the printing, you have to print it."  (Doc. 38-1, ¶ 3).
Further, Wilson reported sexual harassment in a face-to-face meeting with then-Associate
Director, Pam Lyons, and in another face-to-face meeting with  Library Director, Irene Blalock,
and Library Personnel Director, Edith Major.  Angela Hall, the current Library Associate
Director concedes that Library management had "a body of complaints . . .  maybe ten in a year"
from various people regarding patrons using Library computers to view sexually inappropriate
images.  (Hall Dep. Doc. 38-5, at 89-90).   Hall also agrees that the librarians at the downtown

10

branch are exposed to the patrons' ongoing sexual misconduct, including pornography on computers, masturbation or "other types of aggressive behavior like following [the librarians] around."  (*Id.* at 52-53).

*Incidents Involving a Male Librarian*s

Wilson claims to be unaware of any instances in which patrons asked male librarians out on dates; made sexually explicit comments about their bodies; followed them around the Library; touched them in the vicinity of the chest, buttocks, or genitals; or continued to view pornography or masturbate after male librarians caught them.  However, Robert Jones, who is also a Library Assistant in the computer section at the Library's downtown branch, testified that the patrons at the Library subjected him to viewing pornography on a daily basis.  Because the Library asked employees to document which pornographic sites were accessed during a period that exceeded four months, he had to continue viewing the sites after he sent the offending patrons away, printing out some of the web pages and sites for documentation. Robert Jones did not specify the nature of the pornographic sites. During that period, Jones complained verbally to his immediate supervisor, Jim Murray, and also complained in written monthly reports at least twice about having to document the pornographic sites.  However, after his complaints to Murray, Jones received no follow up from the administration.  He therefore "assumed that no one took it serious" and stopped making reports and documenting pornographic sites.  (Doc. 41-1, at 29-31).

Jones also testified about incidents when he viewed fondling between same-sex couples in the bathroom at the downtown Linn Henley Library, although his testimony indicates that they stopped the activity when he caught them.  He does testify about one event that occurred in 2010 in the downtown Library bathroom stalls where another man masturbated while looking at Jones

and did not stop when Jones saw him.  Jones called a security guard to report the incident, and

the guard came approximately twenty minutes later and eventually removed the man from the

Library.  Jones does not recall ever signing an incident report about that event or receiving any

follow-up communications from the Library supervisors or administration.

Dave Ryan, another librarian, provided examples of sites he found on patrons' computers:

"Father Daughter Sex," "Jailbait," "Girl Nude Pics" and a "site that had images of young girls in

bathing suits or may it was underwear."  (Ryan Dep. Doc. 38-10, at 35-36).   Ryan testified that

he regularly saw unwelcome pornographic sites from computers that patrons were using and had

to view such sites when documenting patrons' access for IT filtering.

### Confirmation from other Library Employees about Patrons' Sexual Misconduct

Associate Director Hall agreed that Wilson and other Library employees were faced with

on-going sexual misconduct by patrons, such as pornography access on computers,

"masturbation, or other types of aggressive behavior like following [the librarians] around" and

that her allegations were not "made up."  (Hall Dep. Doc. 38-5, at 13, pp. 52-53).   Librarian

Jones confirmed that such activities occurred at the Library, and Public Service Coordinator

Sandra Lee did not dispute that they did.

### Management's Response to Complaints of Patrons' Sexual Impropriety

*Sexual Harassment Training*

The City of Birmingham held a Sexual Harassment Training seminar at the Library on

August 25, 2009.  The record is unclear whether the City held this training session as a response

to Library staff's complaints about patron misconduct or as a part of City-wide training.  After

the training session, Wilson spoke to Clotfelter and asked if the Library management would

12

adopt the City's policies on sexual harassment discussed at the seminar and require security to enforce those policies.   Clotfelter relayed this concern to Lyons, who followed up with Wilson. Lyons advised Wilson that the Library was "in the process of establishing consistent procedures for dealing with specific behaviors that violate library rules" and had already secured a security expert named Warren Graham to follow up about the issues raised at the seminar and to ensure that the staff and security would work together to deal with patron misconduct and security problems. (Doc. 32-8, at 15).

On October 29, 2009, Graham spoke to the Library staff for "Staff Day" workshop about security, including security for sexual misconduct.  However, Mike Lee had discovered that Graham had no police or FBI training and that Graham's only security background was as a mall guard.  Mike Lee, therefore, felt that his own law enforcement background meant that he was much more qualified to speak about security issues than Graham, and Lee made jokes during Graham's presentation and otherwise broadcast his attitude that Graham's training was a waste of time. Clotfelter characterized the workshop as a "pissing match" between Graham and Mike Lee. (Doc. 32-8, at 7)**.**

*Management's Attitude toward Complaints of Patrons' Sexual Misconduct*

Wilson and Clotfelter, her department head, testified that when they discussed an incident of patron sexual misconduct with Director Blalock, Blalock stated in Wilson's presence, "If you don't like it, leave."  (Doc. 38-6, at 12, p. 47).  Similarly, Wilson testified that Blalock's predecessor who was Library Director until June of 2009, Ms. Sirman, and Sandra Lee, the Public Service Coordinator for the downtown branch of the Library, all used the same response, "If you don't like it, leave" when discussing the patrons' sexual misconduct with Wilson.

13

Other Library employees confirm that the "If you don't like it, leave" was a phrase that Library management and supervisors repeated to Library employees when discussing the patrons' sexual misconduct.  Sandra Lee confirms that Blalock made that same comment more than three or four times in the context of patrons' sexual misconduct at the Library, although Blalock denies making it.  Further, both Clotfelter and Sandra Lee recall Sirman's making that same response to employees complaining of patron's improper sexual conduct at the Library.  Clotfelter testified that Lee herself used the "If you don't like, leave," phrase to a subordinate employee complaining about sexual misconduct in the Library, and while Lee did not specifically remember making that response, she acknowledges that she may have said it in that context on more than one occasion. (Doc. 38-7, at 12, p. 46).  None of this testimony specified what type of sexual misconduct was discussed when Blalock, Sandra Lee, and Sirmans used the "If you don't like it, leave" phrase.

*Management's Guidance about Handling Patrons' Sexual Misconduct*

Both Wilson and Jones expressed frustration at the lack of guidance they received from Library management about how to handle the patrons' sexual misconduct and the lack of response they received from management when they complained about such misconduct.  As one specific example about the lack of guidance, no official or written policy or guideline existed prior to November 2010 about when a patron should be or could be banned from the Library because of misconduct.  Further, the only Library staff personnel who has or had authority to remove patrons from the Library during the relevant time period were the security guards.  The Library system keeps no official system of documenting how many people have been asked to leave the Library or how many times one individual has been asked to leave the Library premises.  Although Library security at one point took pictures of patrons who had been banned to ensure

14

they did not return, security stopped doing so.  It does not and did not flag the Library card number of the misbehaving patron in any way.  The only record the Library security department keeps of patron misconduct is an in-house incident report that may or may not attach a policy report.  Although an outside organization performed two different studies on security at the downtown Library, Mike Lee, the Chief of Security for the Birmingham Public Library System, acknowledges that no one ever interviewed him in connection with the studies or provided him the results of the studies, and he has not specifically asked for the results. Although Mike Lee eventually prepared a security manual called a "Customer Service Handbook," he did not complete that manual and distribute to the Library staff until after Wilson filed suit.

In an email to Lyons on October 30, 2009, Clotfelter also complained that "[t]raditionally our only guidance has been to remove the staff from the area if someone was bothering them and contact security."  (Doc. 32-8, at 18).  Clotfelter also stated in the email that even after recent harassment training, presumably also in 2009, "there wasn't anything after the meeting to say 'we want Library incidents handled this way or we want you to do this. . . .'" (*Id.)*.  Sandra Lee confirmed that when she relayed complaints about sexual misconduct to Mike Lee, he provided no specific information about what steps he would take to handle the problem.

As to patrons' inappropriate viewing of pornographic sites, Wilson testified that when such misconduct occurred, she would  "play it by ear" because the Library did not have a concrete policy on the steps employees should take when faced with computer misuse.  (Doc. 32-1, at 47-50).  The Library had pre-formatted messages that are sent to patrons if they are playing music too loud or if their children are disruptive, but it has no pre-formatted message to advise patrons that they are accessing  inappropriate websites.  If Wilson noticed that a patron was

15

accessing pornographic sites, she would generally try to get another librarian to witness the site access, then she would either tell the patron face-to-face that the site was inappropriate and to get off, or she could send the patron a warning at his terminal and then, if he did not stop, log the patron off the internet remotely.  When the patron's computer is logged off, the image can remain on the librarian's monitor, for security personnel to see and determine how to proceed with the patron, for the librarian to document the inappropriate site and/or for the IT employees to view in case they need to add that site to the blocked list.  Both Wilson and Jones complained to their supervisors about having to document pornographic sites accessed by patrons.  Because Jones did not receive follow-up from those complaints, he stopped complaining about it and reporting and documenting the pornography accessed.

### Assistance from Security Officers

Wilson and Jones also expressed frustration about what they perceived as inadequate assistance of security to combat patrons' sexual misconduct that they experienced or witnessed. Mike Lee testified that five full-time and two part-time security guards work at the downtown Library.  On any given day of the week, four to five security guards plus Mike Lee would all be working at that Library. However, Wilson testified that when she would experience an incident and call security, a lapse of time would exist before security guards would appear "and then they look at you with their eyes rolled."  (Wilson Dep. Doc. 32-1, at 16 p. 61).  The lapse of time would often mean that the patron had left the floor and sometimes the building by the time security responded.

Other Library employees also testified that the attitude of the security department toward complaints of sexual misconduct was a problem.  Sandra Lee testified that when employees

16

complained to Mike Lee about sexually inappropriate misconduct in the Library, he displayed an attitude of skepticism about those complaints. Clotfelter also identified the security department as a problem: "I think we have two problems, security and computers.  The feeling is, security won't do anything and it is a waste of time to call them . . .  We have never been given any other options other than remove yourself from the situation that makes you uncomfortable and call security."  (Doc. 32-8, at 18).

Angela Hall, who is currently the Library's Associate Director responsible for ensuring that the security department receives adequate training, and Sandra Lee both opine that the security guards at the Library have not received sufficient training in dealing with sexual misconduct complaints. Director Blalock similarly acknowledged in her deposition testimony after discussing Warren Graham's seminar about dealing with Library sexual misconduct: "I felt like that we had not done an adequate job of training all staff in handling people and providing good customer service and knowing what to do when that broke down."  (Doc. 32-2, at 20 p. 80).

*Passing along Complaints about Sexual Misconduct to Upper Management*

Edith Major, who is the Library Board's chief personnel officer, was the only person in the Birmingham Public Library System's human resources department at the time of her deposition on June 23, 2011 (the assistant's position had been vacant since May 2010 and Major had hired someone for that position a day or so before the deposition), and is the person responsible for compliance with EEO issues for the entire Library system with seventeen branches and over 280 employees.  Major opines that her department does not have the resources it needs to do its job.  She testified that the first notice she had of Wilson's verbal or written complaints about sexual misconduct at the Library was when Wilson filed her EEOC Charge.

17

Major never conducted an investigation of Wilson's claims of sexual misconduct in the Library, but testified that she would have investigated them if she had known about them.  Majors acknowledges having a relationship with Mike Lee, Chief of Security for the Birmingham Public Library System; according to her, their relationship became romantic some time in 2008 and continues through the present day.

Sandra Lee, the Public Service Coordinator for the downtown Library, acknowledges that although she received monthly reports from employees, she "would hopefully only be about [sic] month or, you know, a couple of months behind" when she finally read them.  (S. Lee Dep., Doc. 38-7, at 6, p.24).  She further acknowledged that not reading an employee's reports of matters such as sexual harassment until months later is problematic.  Lee testified that before March of 2011, she did not pass along employee monthly reports to her supervisors, the Library's Director and Associate Director, and that her supervisors did not necessarily receive notice of complaints of sexual misconduct contained in those monthly reports.  Lee "vaguely remember[s]" discussing with Clotfeleter that Wilson was making complaints about sexual misconduct and she does not dispute Clotfelter's testimony that Clotfelter had several conversations with Lee about Wilson's complaints.  However, Lee does not know whether she passed along Wilson's complaints prior to October 2009.  (S. Lee Depo. , Doc. 38-7, at 7-8 , pp. 28-32).  She does recall advising Lyons of the October of 2009 complaint.

Hall, who is the current Associate Director of the Library, acknowledges that Wilson's reports of sexual misconduct were not brought to her attention until Wilson filed this lawsuit. When discussing sexual harassment behavior at the Library and Wilson's lawsuit, Hall stated "It's been a lot of years of things not happening as it should."  (Hall Dep., Doc. 38-5, at 12, p.

48).

*Wilson's EEOC Charge, Lawsuit, and Leaving Employment*

In October of 2009, Wilson filed a charge of discrimination with the EEOC, asserting that a sexually hostile work environment existed at the downtown Library.  On September 2, 2010, Wilson filed the instant lawsuit, asserting one count entitled "Title VII - Sexual Harassment (Hostile Work Environment)."  Wilson left her work at the Library in November of 2010, claiming that she left because she "continued to be subjected to unwelcome, offensive, sexually charged conduct by patrons."  (Wilson Aff., Doc. 38-1, ¶ 5).

*Post-Lawsuit Changes*

In November 2010, a few months after Wilson filed this lawsuit, Mike Lee prepared an employee security manual for addressing patron misconduct, called the Customer Service Handbook –  this was the first written policy setting forth guidelines about how to address patron misconduct.  In January 2011, about four months after Wilson filed the lawsuit, the Library placed the computers in a centralized location on the downtown Library's third floor as a result of a grant. The centralization of the computers facilitates security's maintaining a more regular presence around the computers and more efficiently addressing sexual misconduct involving them.

**The Identity of Wilson's Employer(s)**

In its Answer, the Library Board acknowledged that it employs Wilson, that it controls the assets and operates the downtown branch of the Library on behalf of the City of Birmingham, and that it is subject to suit in federal court.  The Library Board acknowledges that it controls and

manages employees of the Library on behalf of the City, and indeed, Section 2-5-73 of the

Birmingham City Code provides that the Library Board has authority "to manage and control the

Birmingham Public Library . . .to provide rules and regulations for its own governance, [and] the

governance of its officials and employees. . . ; [and] to appoint a library director, librarians,

library assistants, employees, servants and agents in such number as may be necessary for the

proper administration of the library." (Doc. 32-14, at 1-2.).  Under Alabama law, §§ 11-90-1

through 4 of the Alabama Code, the Library Board has "full power and authority" to control the

expenditure of all funds received by the Library, or appropriated to the Library, to employ a

Library and other Library employees, and to manage and control the Library. Despite these laws

and the Library Board's own acknowledgments in its pleading, the Board *now* takes the position

in its briefs that it is not the "employer" within the meaning of Title VII.

The City of Birmingham is the entity that pays Wilson, provides employment benefits to

her, handles FMLA and Workers Compensation matters for Wilson, keeps a personnel file on

her, and funds the operation of the Library. Wilson testified that she is an employee of both the

Library Board and the City of Birmingham.

## STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary

judgment allows a trial court to decide cases when no genuine issues of material fact are present

and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a

district court reviews a motion for summary judgment it must determine two things: (1) whether

any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)   Substantive law determines which facts are material and which are irrelevant.  *Id*. at 248.  In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P.

56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28

U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to

assess the proof in order to see whether there is a genuine need for trial.").  "The non-moving

party need not present evidence in a form admissible at trial; however, he may not merely rest on

his pleadings."  *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999)

(citing *Celotex,* 477 U.S. at 324).  If he does, or if the evidence is "merely colorable, or is not

significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50

(citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented

through the prism of the substantive evidentiary burden," to determine whether the nonmoving

party presented sufficient evidence on which a jury could reasonably find for the nonmoving

party.  *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir.

1988).  The court must refrain from weighing the evidence and making credibility

determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S.

at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v.

State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  Furthermore, all evidence and

inferences drawn from the underlying facts must be viewed in the light most favorable to the

non-moving party.  *Graham*, 193 F.3d at 1282.  The non-moving party "need not be given the

benefit of every inference but only of every reasonable inference."  *Id.*  The evidence of the non-

moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor."

*Anderson*, 477 U.S. at 255.  After both parties have addressed the motion for summary judgment,

the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party

is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

## DISCUSSION

### A.  The Capacity of the Birmingham Library Board

Defendants argue that summary judgment is due to be granted in favor of the Birmingham

Library Board because the City is her "employer" for the purposes of Title VII and not the

Library Board.  Put another way, they argue the City is the only proper Defendant because the

Library is an administrative division or department of the City of Birmingham, and is not a legal

entity subject to suit in its own capacity.  The court notes that this position is contrary to the

Birmingham Library Board's Answer, admitting without qualification the averments in paragraph

7 of the Amended Complaint, which states:   "Defendant, Birmingham Library Board, is an entity

created by *Birmingham City Code Section* 2-5-71, et. al. and is subject to suit in this Court."

(Doc. 12, at 2 ¶ 7).  The Library Board has not amended or attempted to amend that Answer.

Accordingly, the court finds that summary judgment is not due to be granted in favor of the

Birmingham Library Board and against Wilson on that ground.

### B.  Hostile Work Environment

Title VII of the Civil Rights Act prohibits employers from discriminating in the

workplace on the basis of an individual's "race, color, religion, sex, or national origin."  42

U.S.C. § 2000e-2(a).  This Title VII case differs from so many asserting employment

discrimination in that the sexual acts at the core of the case were not committed by Wilson's

supervisors, management, or co-employees.  Rather, the sexual misconduct is that of patrons who

come into this public facility where the Wilson worked.  Defendants place great emphasis on the

fact that the Library is a public institution open to the general population and that the members of

the public – not its employees – are the ones committing the sexual harassment. However,

Wilson complains that Defendants created a hostile work environment when they failed to

protect their employees from the sexual harassment and, in effect, shrugged their shoulders and

said, "What's a public institution to do with these bad boys?" Wilson asserts, however, that

because Defendants had notice of the patrons' repeated acts of sexual harassment, they had an

obligation to establish policies and procedures that sufficiently protect Library employees from

that harassment and/or ensure that personnel are sufficiently responsive to the sexual harassment.

Wilson argues that their failure to do so resulted in a sexually abusive workplace.   The court

agrees that she has established a *prima facie* case on her hostile work environment claim for the

reasons discussed below.

1. **Statute of Limitations**

Defendants argue that some of the acts supporting Wilson's claims predate her EEOC

charge by more than 180 days and, thus, the court may not consider those acts because claims

based on them are time-barred.  However, Defendants' argument is not well taken.  The cases

they cite in support of their position are not Title VII hostile work environment cases, and are

inapposite.  Where a hostile work environment claim is asserted, the court can consider acts that

fall outside the 180 day period if all the acts are part of the same discriminatory practice and at

least one acts falls within the filing period.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S.

101, 115-17  (2002).   The reasoning behind this rule is that hostile work environment claims are

based on an "unlawful employment practice" – not one discrete act but repeated conduct that

occurs over time and, when viewed collectively, establishes a policy or practice.   One single act

of harassment or the employer's failure to respond to harassment "may not be actionable on its

own" in hostile work environment cases.  Therefore, the court may consider the entire period of

the hostile environment – including "component acts" that fall *outside* the statutory time period –

"[p]rovided that an act contributing to the claim occurs within the filing period."  *Id.* at 116-17.

Applying that law to the instant case, the court disagrees with Defendants' position that

the court should only consider misconduct that occurred on or after April 10, 2009.  Wilson has

indeed alleged acts that fall within the statutory period, and to the extent that other misconduct

occurred before April 10, 2009, the court  may consider whether those older acts constitute

component acts contributing to the hostile work environment claim.  However, the court notes

that even without considering pre-April 2009 acts, the court would reach the same result, i.e., that

Wilson has presented sufficient evidence based on what occurred at the Library on or after April

10, 2009 to support her *prima facie* case of a hostile work environment claim.

2.  **Prima Facie Case**

When dealing with  cases asserting claims of sexually hostile work environments, the

Eleventh Circuit has announced  four "core principles"of employment discrimination law:

> first, to prove a hostile work environment under 42 U.S.C. § 2000e-
> 2(a)(1), a plaintiff must show that her employer discriminated because
> of her membership in a protected group, and that the offensive conduct
> was either severe or pervasive enough the alter the terms or conditions
> of employment; second, Title VII is not a civility code, and not all
> profane or sexual language or conduct will constitute discrimination in
> the terms and conditions of employment; third, workplace conduct
> cannot be viewed in isolation, but rather is to be viewed cumulatively,
> and in its social context; and fourth, a plaintiff can prove a hostile
> work environment by showing severe or pervasive discrimination
> directed against her protected group, even if she herself is not
> individually singled out in the offensive conduct.

*Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010).  With this

25

guidance in mind, the court must determine whether Wilson has established her *prima facie* case

of discrimination based on a sexually hostile work environment.  To do so, she must show

> (1) that [ ] she belongs to a protected group; (2) that the employee has
> been subject to unwelcome sexual harassment, such as sexual
> advances, requests for sexual favors, and other conduct of a sexual
> nature; (3) that the harassment must have been based on the sex of the
> employee; (4) that the harassment was sufficiently severe or pervasive
> to alter the terms and conditions of employment and create a
> discriminatorily abusive working environment; and (5) a basis for
> holding the employer liable.

*Id.* at 808 (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)

(citation omitted)).  Defendants argue that Wilson has not met her *prima facie* case because she

has failed to prove elements three and four above.

### Element Three: Harassment Based on Sex

Wilson's evidence reflects that she was faced regularly with unwelcome views of

pornography from computers that patrons used and also suffered from frequent unwelcome

harassment of a sexual nature from patrons.  The Eleventh Circuit has explained, however, that

proving harassment or exposure to profanity or pornography is not enough to make a case falling

within Title VII's purview; a plaintiff must also prove that the harassment was *based on her*

*protected status*:  "Title VII does not prohibit profanity alone, however profane.  It does not

prohibit harassment alone, however severe and pervasive.  Instead, Title VII prohibits

discrimination, including harassment that discriminates based on a protected category such as

sex." *Baldwin v. Blue Cross/Blue Shield of Ala.,* 480 F.3d 1287,  1301-12 (11th Cir. 2007).  Put

another way, "Title VII's test [] is whether 'members of one sex are exposed to disadvantageous

terms or conditions of employment to which members of the other sex are not exposed.'" *Reeves*,

594 F.3d at 809 (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998)).

In the instant case, the evidence reflects that all librarians at the downtown Library, including male librarian(s), were regularly subjected to viewing pornography that patrons accessed on Library computers, and were also subjected to patron misconduct of a sexual nature.  For example, librarians Robert Jones and Dave Ryan both testified that they regularly saw unwelcome pornographic sites from computers patrons were using and had to view such sites when documenting patrons' access for IT filtering.  Although Jones does not specify the nature of the pornography – i.e., whether the pornography involved naked women or men or both – Jones does state that, whatever its nature, the pornography offended him, and he complained about it.  The examples Ryan provided of sites he founds on patrons' computers were "Father Daughter Sex," "Jailbait," "Girl Nude Pics,"  and a "site that had images of young girls in bathing suits or may it was underwear." (Ryan Dep. Doc. 38-10, at 35-36).  Jones further testified about experiencing one incident involving a male patron masturbating while looking directly at Jones, and two incidents of same sex couples fondling each other in the stacks and in the Library bathroom.  Defendants argue, therefore, that the patron misconduct affected all librarians; they claim women librarians at the Library were not exposed to employment terms and conditions that were different than those to which male librarians were exposed.

Indeed, the Eleventh Circuit has explained that "[w]here both gender-specific and general, indiscriminate vulgarity allegedly pervaded the workplace, we reaffirm the bedrock principle that not all objectionable conduct . . . amounts to discrimination under Title VII. . . . Title VII is not a 'general civility code.'"  *Reeves,* 594 F.3d at 809 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

However, Wilson argues that the sexual misconduct at the Library was directed primarily at women and at her as a woman.  She presented the following facts to support the gender-specific nature of the sexual harassment: (1) "Patrons made advances on me, asking me out on dates, dozens of times. . .and star[ing] at me;" (2) "Twenty or more times, male patrons would leer at me and follow me around the library;" (3) "I had one patron rub up against my buttocks with his erect penis;" (4) "One patron came in almost every day for several months and sat a desk near my desk and stared at me . . . followed me from floor to floor;" (5) "[A] patron told me "You have pretty lips;" (6) "Another told me 'I want to paint your face' with a nasty look on his face;" (7) during her first years at the Library, male patrons made sexually charged comments about Wilson's body such as "You have some big titties," "You have a nice ass," and "Look at you just shaking that ass;" (8) during the last year at the Library, one patron would make comments to Wilson like, "When are we going to go out?" or "Are you going to marry me?" and "Stop calling me a man-whore;" (9) patrons looking at pornographic pictures or video would note that Wilson had seen the images and would make eye contact and smile at her and her obvious discomfort; (10) With one exception, the pornographic sites Wilson saw were accessed by *male* patrons in her presence and depicted only heterosexual sexual acts or nude pictures of females without nude depictions of males; (11) she observed males masturbating or fondling their genitals while making eye contact at her and smiling or staring; (12) Wilson observed a male fondling his genitals while looking at young girl patrons; (13) Wilson never heard a patron ask a male librarian for a date or say sexually explicit things to them about their bodies or follow them around the Library, or touch them in the vicinity of their chest, buttocks or genitals; (14) Wilson never saw a patron continue to view pornography or continue to masturbate after getting caught by a male librarian.

As noted previously, although Wilson herself may not have been aware of sexual harassment or misconduct on the part of patrons directed at male librarians, the evidence reflects that some of the misconduct was indeed directed at or experienced by male librarians.  However, despite the evidence of some generic harassment, Wilson's testimony provides specific examples of repeated harassment of a sexual nature directed at women and at her in particular.  Even if the male librarians were subjected regularly to viewing pornographic sites, they did not, with a few isolated exceptions, suffer the other harassment of a sexual nature that Wilson regularly experienced: men following her around, making inappropriate comments to her about her body and wanting to date her, men fondling themselves while staring at her or another female, etc.  Further, even though the male librarians acknowledge that they were also subjected to pornography, the sites Jones specified in his testimony as examples of ones patrons accessed were sites that objectified women and not men: "Father Daughter Sex," "Jailbait," "Nude Girl Pics," and a site with images of young girls in bathing suits or underwear.

The court finds that Wilson has presented substantial evidence that, if believed, would establish that the harassment she experienced was based on her protected status as a woman.

*Element 4: Sufficiently Severe or Pervasive to Alter the Terms of Employment*

Defendants also assert that Wilson has failed to establish element four - the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

When evaluating the severity of the harassment in element four, the Eleventh Circuit uses both an objective and subjective test: "th[e] behavior must result in both an environment 'that a reasonable person would find hostile or abusive' and an environment that the victim 'subjectively

29

perceive[s] ... to be abusive.'" *Miller,* 277 F.3d at 1276 (quoting *Harris v. Forklift Sys., Inc. ,* 510 U.S. 17, 21-22 (1993)).  The court should consider the following factors, sometimes referred to as the *Allen* factors, in evaluating the objective severity: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with the employee's job performance." *Miller*, 277 F.3d at 1276 (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997)).

Defendants do not argue that Wilson did not meet the subjective test, and the court finds that Wilson has presented substantial evidence that she subjectively perceived her environment to be sexually abusive.

In arguing that the incidents of sexual harassment do not meet the objective test – a reasonable person would not find the incidents of harassment sufficiently hostile or abusive – Defendants point to a total of three *written* complaints of sexual harassment that Wilson presented in the relevant period from April of 2009 through leaving employment in November of 2010.  The court has previously pointed out that, as this claim is one for hostile work environment, Defendants incorrectly narrow the relevant period.  Further, in focusing exclusively on Wilson's written complaints, Defendants again inappropriately limit the harassing incidents; Defendants are wrong to blithely assume that the only incidents that matter are those that are reduced to writing.  The evidence emanating not only from Wilson but also from the testimony of her co-workers and *supervisors* reflects that the incidents of sexual harassment occurred regularly – sometimes daily – during her employment.  The evidence also reflects that Wilson complained not only in writing but also verbally to supervisors and security personnel, the correct chain of command for such

complaints. A jury could find that Wilson is hardly to blame for failing to reduce the almost daily barrage of  incidents to writing, particularly when her own supervisors acknowledge that they rarely and certainly belatedly passed the written complaints higher up the chain of command. Further, the court notes testimony that the upper management actually *discouraged* reporting patrons' sexual harassment with the rather callous mantra of "If you don't like it, leave."  Contrary to Defendants' assertions, the court finds that the evidence, if believed, does establish that the incidents of sexual harassment were regular and frequent enough to present a case for hostile work environment.

As to the severity of the sexual harassment, a jury could well find that although some of the incidents alone would not be severe, the frequency of the incidents with computer pornography and amorous patrons making remarks about her body and following her around the Library, when combined with the severe stand-alone incidents like masturbation and fondling genitals, were severe enough, humiliating enough, and interfered with her job performance enough to alter the terms and conditions of her employment.  Therefore, the court finds that Wilson has presented sufficient evidence of element four of her *prima facie* case.

*Element Five: A Basis for Holding the Employer Liable*

Defendants also assert that they cannot be held liable for the misconduct of their patrons because they established adequate procedures and policies to protect against patrons' misconduct and, given that they cannot predict when patrons will misbehave, they have only the ability to react to the misconduct.  However, Defendants miss the point:  Wilson's complaint is that Defendants' procedures and policies were neither adequate nor adequately enforced.

Of course, Defendants can only be held liable for a sexually hostile work environment if

31

they had notice of the sexual harassment. The court first recognizes that undisputed evidence establishes Defendants' notice of Library patrons' regular sexual misconduct. Ironically, one of the few people who claimed ignorance of Wilson's complaints of sexual misconduct prior to her EEOC charge was the one whose job it was to ensure that the Library complied with EEO issues: Edith Majors, the Library's chief personnel officer. Further irony exists that she was romantically involved with the person responsible for security at the Library, which would logically result in more information about sexual harassment incidents at the Library rather than less[2].

In any event, other Library management personnel were aware of the sexual harassment. The Library's Associate Director Hall acknowledges that Library employees were faced with regular, on-going sexual misconduct by patrons, and Department Head Clotfelter acknowledged that Wilson gave her multiple monthly reports expressing concerns about sexual misconduct by patrons directed at her or occurring within her presence. Clotfelter testified that she passed those concerns along to the Library's Public Service Coordinator Sandra Lee. Although Lee does not recall whether she passed Wilson's specific complaints higher up the Library ladder, the evidence reflects that the complaints of Wilson and other librarians certainly provided notice to the Defendants of the problems with patron misconduct at the Library, both generalized and specifically experienced by Wilson. Further, Wilson provided notice of the harassment she experienced through the proper channels.

Given that notice, Defendants point to policies in place to address the sexual misconduct,

---

[2] Defendants insist that the relationship breaks no Library or City rule. However, given Majors's curious ignorance about sexual harassment at the Library and the alleged failure of policies to adequately address security matters as they relate to sexual harassment, the relationship raises interesting questions.

and argue that, through their policies, they did their best to handle a difficult problem.  The Library's Internet Policy did indeed prohibit illegal activities such as the dissemination or public display of obscene matter, and its Patron Behavior Policy prohibited noisy or disruptive behavior; verbal abuse or threatening gestures toward the staff or patrons; illegal acts; and use of Library equipment that violated Library policies and rules.  Further, the Library had a policy prohibiting sex discrimination, harassment, and retaliation.

However, Wilson claims that Defendants cannot stand *behind* these policies to protect themselves from liability because they did not effectively stand *by* them to protect their employees from sexual harassment.  Put another way, Defendants did not have effective procedures in place to enforce those policies and to react appropriately to the violations.

Based on the evidence presented, a jury could well find that the Library's attempt to enforce its policies against sexual harassment could be characterized as, at best, ineffectual hand-wringing and, at worse, callous indifference to the problem.  As examples, Wilson's evidence reflects (1) that multiple supervisors' repeated response to complaints of patrons' sexual misconduct was "If you don't like it leave;" (2) that complaints of sexual harassment in monthly reports were often not read until a month or two after the report date, and then were not passed up the ladder for action; (3) that librarians became discouraged about reporting sexual harassment when they saw little or no response to those reports; (4) that the Library had no specific written policy or procedure to assist and/or train employees regarding the handling of patron sexual harassment until November of 2010, after Wilson filed suit and approximately the time she left the Library permanently; (5) that the unwritten rule about handling sexual harassment was to call security, but calling security was often ineffective - guards often failed to arrive promptly and when they did, they often

displayed a skeptical attitude about sexual harassment complaints, and failed to keep effective records of patron offenders tied to patrons' Library cards; (6) that the Library's security chief was not supportive of the one training seminar about sexual harassment the Library held; (7) that the Library security personnel otherwise received little training about handling sexual harassment; (8) that the computers were not centralized until January 2011 for effective security patrol and monitoring; and (9) although much of the sexual harassment complaints centered around the computer areas, the Library did not place video surveillance cameras in the computer areas.  Based on this and other evidence, the court finds that Wilson has presented sufficient evidence that – if the jury believes it – would establish a basis for holding her employers liable for the pervasive sexual harassment occurring at the Library.

Therefore, Wilson has presented sufficient evidence to support her *prima facie* case on the sole claim for sexually hostile work environment.  The court finds that Defendants' motion for summary judgment is due to be DENIED.  This case will proceed to pretrial and trial.

The court will enter a separate Order consistent with this Memorandum Opinion.

Dated this 10th day of February, 2012.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

34